# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO.: 08-23487-CIV-HUCK

PABLO SAN MARTIN,

      Petitioner,

v.

WALTER A. MCNEIL, Secretary of the
Florida Department of Corrections,

      Respondent.

_____/

### ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

This matter came before the Court upon Pablo San Martin's Petition for Writ of Habeas Corpus by a Person in State Custody (D.E. #1). This Court has reviewed the Petition, the pertinent portions of the record, and is otherwise duly advised in the premises. Having determined that the Petition is untimely and finding that adequate grounds for equitable tolling or consideration under an "actual innocence" framework do not exist, the Petition is denied.

## I.    Factual and Procedural Background

On September 23, 1993, a Miami-Dade County jury convicted the Petitioner of several crimes arising out of a December 6, 1991 attempted robbery that resulted in the death of an individual.[1] On November 4, 1993, that jury recommended that the trial court sentence the Petitioner to death. The trial court accepted the jury's recommendation and imposed a death sentence on the Petitioner on November 23, 1993.

Under the Florida Constitution, the Florida Supreme Court hears all appeals from trial court final judgments resulting in the imposition of a death sentence. *See* Fla. Const. art. V, § 3(b)(1). After hearing the Petitioner's appeal, that court affirmed the trial court's judgment. *San Martin v.*

---

[1]    Specifically, the jury convicted the Petitioner of (1) first degree murder, (2) two counts of attempted first degree murder with a firearm, (3) attempted robbery with a firearm, (4) two counts of third degree grand theft, and (5) unlawful possession of a firearm while engaged in a criminal offense.

*State*, 705 So. 2d 1337, 1351 (Fla. 1997). In its order affirming the Petitioner's conviction and death sentence, the Florida Supreme Court summarized the facts underlying the Petitioner's crime, which was committed with the assistance of three other individuals:

> Danilo Cabanas Sr., and his son Danilo Cabanas, Jr., operated a check-cashing business in Medley, Florida. On Fridays, Cabanas Senior would pick up cash from his bank for the business. After Cabanas Senior was robbed during one of his bank trips, his son and a friend, Raul Lopez, regularly accompanied him to the bank.
>
> On Friday, December 6, 1991, the trio left the bank with $25,000 in cash. The Cabanases rode together in a Chevrolet Blazer driven by the son; Lopez followed in his Ford pickup truck. As the trio drove alongside the Palmetto Expressway, their vehicles were "boxed in" at an intersection by two Chevrolet Suburbans. Two masked men exited from the front Suburban and began shooting at the Cabanases. When Cabanas Senior returned fire, the assailants returned to their vehicles and fled. Cabanas Junior also saw one masked person exit the rear Suburban.
>
> Following this exchange of gunfire, Lopez was found outside his vehicle with a bullet wound in his chest. He was transported to the hospital, but died shortly thereafter.
>
> The Suburbans driven by the masked men were found abandoned. It was subsequently determined that both vehicles had been stolen. The Suburbans suffered bullet damage, including thirteen bullet holes in one vehicle. The Cabanases' Blazer was also riddled with ten bullet holes.
>
> San Martin's confession and a subsequent statement, in which he told the police where he had disposed of the weapons used in the incident, were admitted at trial. San Martin refused to allow either statement to be recorded stenographically, but did sign a waiver of his *Miranda* rights and orally confessed to the crime. San Martin admitted his involvement in the incident and recounted the details of the plan and how it was executed. He explained that Fernando Fernandez had told him and Franqui about Cabanas's check cashing business several months before this incident and that they had planned the robbery by watching Cabanas to learn his routine. He also explained how they used the stolen Suburbans to "box in" the victims at an intersection: San Martin and Abreu drove in front of the Cabanases' Blazer and Franqui pulled alongside the Blazer in the second Suburban so that the Cabanases could not escape. He also recounted that a brown pickup driven by Cabanas's "bodyguard" drove up behind the Blazer. San Martin stated that he exited the passenger side of the first Suburban armed with a 9 mm semiautomatic pistol and that Abreu exited the driver side armed with a "small machine gun." San Martin admitted that he initiated the robbery attempt by telling the occupants of the Blazer not to move and that he shot at the Blazer when the driver fired at them. However, he denied firing at Lopez's pickup. San Martin also detailed Franqui's role in the planning and execution of the crime. He placed Franqui in proximity to Lopez's pickup, but could not tell if Franqui fired his gun during the incident. San Martin

2

initially claimed that he had thrown the weapons used in the incident off a Miami Beach bridge, but in a subsequent statement admitted that he had thrown the weapons into a river near his home and drew a map detailing the location. Two weapons, a 9 mm semiautomatic pistol and a .357 revolver, were later recovered from that location by a police diver. San Martin did not testify at trial, but his oral confession and subsequent statement about the guns were admitted into evidence.

Franqui's formal written confession was also admitted at trial, over San Martin's objection. Franqui initially denied any knowledge of the Lopez shooting but confessed when confronted with photographs of the bank and the Suburbans. Franqui recounted the same details of the planning and execution of the crime that San Martin had detailed. Franqui admitted that he had a .357 or .38 revolver. He also stated that San Martin's 9mm semiautomatic jammed at times and that Abreu carried a Tech-9 9 mm semiautomatic which resembles a small machine gun. Franqui claimed that he returned fire in Lopez's direction after Lopez opened fire on him.

A police firearms expert testified that the bullet recovered from Lopez's body was consisted with the .357 revolver used by Franqui during the attempted robbery. The expert also stated that a bullet recovered from the passenger mirror of one of the Suburbans and a bullet found in the hood of the Blazer were definitely fired from the same gun as the Lopez bullet. However, due to the rust on the .357 recovered from the river, the expert could not rule out the possibility that all three bullets had been fired from another .357 revolver.

*Id.* at 1341-42.

On October 5, 1998, the U.S. Supreme Court affirmed the Florida Supreme Court's ruling, concluding direct review of the Petitioner's conviction and sentence. *San Martin v. Florida*, 525 U.S. 841, 841 (1998).

The Petitioner filed a motion for post-conviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure on October 4, 1999. The trial court denied that motion and, on August 28, 2008, the Florida Supreme Court affirmed the trial court's denial of the Petitioner's motion for post-conviction relief. *San Martin v. Florida*, 995 So. 2d 247, 265 (Fla. 2008). The Florida Supreme Court's mandate issued on December 3, 2008.

The Petitioner filed this petition for writ of habeas corpus on December 18, 2008. The grounds for relief alleged in the Petition are that (1) the Petitioner is actually innocent (a) for all of the reasons listed in the Petition and (b) because the State presented false or misleading testimony and withheld evidence that was favorable to the Petitioner; (2) the Petitioner's lawyer during the

guilt phase was ineffective in that he (a) failed to cross-examine the Petitioner's co-defendant as to the intent or plan to kill, (b) failed to challenge the pre-arrest procedure employed by the police, (c) failed to cross-examine certain witnesses, (d) prevented the Petitioner from testifying in his own defense, (e) failed to present evidence regarding the Petitioner's lack of intelligence and mental acuity insofar as those impediments undermined the Petitioner's ability to competently waive his *Miranda* rights, (f) failed to present a coherent defense when he argued that the Petitioner's confession was coerced but did not present any evidence supporting that argument, (g) failed to object at various points during the trial and thereby waived certain appellate issues, and (h) individually and cumulatively committed errors that deprived the Petitioner of a fair trial; (3) the Petitioner's lawyer during the penalty phase was ineffective in that he (a) failed to conduct a reasonable investigation into the Petitioner's background, (b) failed to adequately prepare and present a cohesive psychological theory through the experts who testified in mitigation, (c) failed to present a clinical social worker, (d) allowed the trial court to operate under a presumption of death, and (e) had a conflict of interest with and lacked the trust of the Petitioner; (4) the Petitioner's post-conviction motion was not adequately considered by the State courts; and (5) the Petitioner was sentenced under an unconstitutional death penalty scheme.

The State argues that the Petition should be dismissed as untimely.[2]

## II.    Framework for Review

This Petition is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act. Under § 2254, a federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in [State custody] only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

An individual seeking a federal writ of habeas corpus must file his petition within one year of "the date on which the judgment became final by the conclusion of direct review or the expiration

---

[2]      The State responds to each of the grounds for relief set forth in the Petition. Because the Court determines that the Petition is untimely, those grounds need not be, and therefore are not, discussed further.

4

of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).[3] This one-year limitation, however, is tolled during the pendency of any "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim." 28 U.S.C. § 2244(d)(2).

Direct review of a state judgment of conviction concludes on the date of the U.S. Supreme Court's denial of a petition for writ of certiorari. *See Washington v. United States*, 243 F.3d 1299, 1300-01 (11th Cir. 2001)(holding that a conviction becomes final on the day the U.S. Supreme Court denies a petition for writ of certiorari). Consonant with Rule 6(a)(1) of the Federal Rules of Civil Procedure, AEDPA's one-year limitation begins to run from the date after the U.S. Supreme Court's order denying the petition for writ of certiorari. *Id.* at 1301.

The AEDPA clock continues to run until the individual seeking review files a state motion for post-conviction relief. Once the individual files a motion for post-conviction relief, the AEDPA clock stops. § 2244(d)(2). The AEDPA clock resumes running when the state's highest court issues its mandate disposing of the motion for post-conviction relief. *Lawrence v. Florida*, 549 U.S. 327, 331-32 (2007).

If an individual seeking a federal writ of habeas corpus files his petition beyond the one-year limitation, the district court may still review the petition if it was untimely filed because of "extraordinary circumstances that [were] both beyond [the petitioner's] control and unavoidable even with diligence." *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1999). This principle, known as equitable tolling, should be applied sparingly and its use should be limited to exceptional circumstances, and the burden of proving circumstances that justify the application of the equitable tolling doctrine rests squarely on the petitioner. *Drew v. Dep't of Corrs.*, 297 F.3d 1278, 1286 (11th Cir. 2002). If a petitioner makes no effort to demonstrate that he meets the criteria set forth in *Sandvik*, then he is not eligible for equitable tolling. *Sibley v. Culliver*, 377 F.3d 1196, 1204 (11th Cir. 2004).

A court may also consider an untimely § 2254 petition if, by refusing to consider the petition for untimeliness, the court would endorse a "fundamental miscarriage of justice" because it would

---

[3]        The one-year limitation may be triggered by other events detailed in § 2244(d)(1). None of those grounds, however, is applicable in this case.

require that an individual that is actually innocent remain imprisoned. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001). A court's review of an actual innocence claim is "exceedingly narrow in scope" and requires that a petitioner demonstrate that he is factually innocent rather than legally innocent. *Id.*; *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense" and "'to be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Id.* quoting *Schlup v. Delo*, 513 U.S. 298 (1995). The applicable standard of review is "whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt." *Johnson*, 256 F.3d at 1172.

Finally, a court may consider an untimely § 2254 petition if the petitioner is able to show that he is "'innocent' of the death penalty because none of the aggravating factors legally necessary for invocation of the death penalty applied." *Sibley*, 377 F.3d at 1205. A court's review of an actual innocence of death claim concludes when the court is satisfied of the existence of the minimum state law requirements concerning the presence of aggravating factors. *Id.* The petitioner bears the burden of showing by clear and convincing evidence that "but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Id.* at 1205-06. In this respect, a petitioner asserting an actual innocence of death claim carries a higher burden than one asserting a claim of actual innocence of the underlying crime. *Id.* at 1206.

### C.    Analysis

This Court finds that the Petition is untimely under § 2244(d)(1)(A). As noted in Part I of this Order, direct review of the Petitioner's conviction concluded on October 5, 1998, when the U.S. Supreme Court denied the Petitioner's petition for writ of certiorari. Accordingly, by application of Fed. R. Civ. P. 6(a)(1), the Petitioner had until October 6, 1999, to file this Petition. The Petitioner waited 363 days until he filed his Rule 3.850 motion for post-conviction relief. The Petitioner's filing of the Rule 3.850 motion tolled the one-year limitation until December 3, 2008, when the Florida Supreme Court issued its mandate denying the relief the Petitioner sought. 28 U.S.C. § 2244(d)(2); *Lawrence*, 549 U.S. at 331-32. Accordingly, the Petitioner had until December 5,

6

2008, to file the Petition. The Petition is untimely because the Petitioner filed it on December 18, 2008.

For the reasons set forth below, this Court determines that the Petition is not subject to review under the doctrines of equitable tolling, actual innocence of the underlying crime, or actual innocence of the death penalty.

### 1.    Equitable Tolling

In his Petition and Reply to the State's Response to the Order to Show Cause, the Petitioner did not expressly request the application of equitable tolling to his untimely Petition ostensibly because the Petitioner has maintained that the Petition is not untimely under AEDPA's one-year limitation.[4] *See* D.E. #19 at 2. The Petitioner argues that the Petition was timely because (1) although the U.S. Supreme Court denied San Martin's petition for writ of certiorari on October 5, 1998, "this fact was recorded and notified to Petitioner until [sic] October 19th, 1998, when it was recorded for record [sic] with the clerk of Court's [sic] of the Florida Supreme Court"; (2) San Martin "had no counsel of record nor contact with the Court of appeals [sic] until after that date"; and (3) "the time period at issue is also covered by the tolling of limitations period that affected [sic] Florida in due to [sic] hurricane [sic] Floyd, which struck on September 14th, 1999, resulting in a two day tolling of limitations." *Id.* at 3. Because these are not statutory grounds for tolling the one-year limitation, this Court construes these grounds as requests for equitable tolling. The Petition, filed thirteen days late, is ineligible for equitable tolling.[5]

---

[4]    In fact, the Petitioner first requested the application of equitable tolling in response to this Court's order requesting further briefing on the application of equitable tolling.

[5]    When the Petitioner's State post-conviction relief ended, he had two days remaining in which to file this Petition. This is a very short period in which to file an important and often lengthy petition for legal relief. But it is not lost on this Court that the Petitioner imposed this circumstance on himself by waiting 363 days to file his Rule 3.850 motion. In addition, this Court is aware that although the one-year limitation continued to run from the date of the Florida Supreme Court's mandate (December 3, 2008), that court affirmed the trial court's denial of the Petitioner's Rule 3.850 petition on August 28, 2008, and denied the Petitioner's application for rehearing on September 11, 2008. A diligent petitioner, knowing that only two days remained on his AEDPA clock, could have used the months before the issuance of the Florida Supreme Court's mandate to prepare his federal habeas petition. True as ever, equity aids the vigilant, not those who slumber on their rights.

### a.    Delayed Notification of U.S. Supreme Court Ruling

The Petitioner's first ground for equitable tolling of the one-year limitation, though inartfully articulated, is that he did not receive actual notice of the U.S. Supreme Court's denial of his petition for writ of certiorari until that denial was docketed fourteen days later in the Florida Supreme Court. This argument does not warrant the application of equitable tolling.

The plain language of § 2244 holds that the one-year limitation begins to run from "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review." 28 U.S.C. § 2244(d)(1). In *Washington*, the Eleventh Circuit held that direct review concludes on the date of the U.S. Supreme Court's order denying the petition for writ of certiorari. 243 F.3d at 1300-01. In holding so, the Eleventh Circuit indicated that it was following the reasoning of every other circuit court that had considered the issue. *Id.* at 1300. Those other courts have grounded their reasoning in U.S. Supreme Court Rule 16.3 which holds that "[t]he order of denial [of a petition for a writ of certiorari] will not be suspended pending disposition of a petition for rehearing except by order of the Court or a Justice." *See, e.g., Giesberg v. Cockrell*, 288 F.3d 268, 271 (5th Cir. 2002). Accordingly, the U.S. Supreme Court's denial of the petition for writ of certiorari takes legal effect immediately and without regard to the 25-day rehearing period set forth in U.S. Supreme Court Rule 44.3 or the delay between the U.S. Supreme Court's order and its docketing in another court.

Courts have also rejected the Petitioner's argument that the one-year limitation should run from the date he actually received notice that his direct review had concluded. *Williams v. Florida*, 221 F.App'x 867, 870 (11th Cir. 2007); *Rouse v. Lee*, 339 F.3d 238, 245 (4th Cir. 2003)("The limitations period of the AEDPA, however, runs from 'the date on which the judgment became final,' not from the date on which [the Petitioner] was served with (or, in this case, merely received) notification of the final judgment."); *United States v. Battles*, 18 F.App'x 495, 496 (9th Cir. 2001)(rejecting petitioner's argument that the AEDPA limitations period ran from the date he received actual notice of the U.S. Supreme Court's denial of his certiorari petition because "a conviction has become final, for habeas purposes, when either the time to petition for certiorari has elapsed or the petition is actually denied"); *Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000)(rejecting petitioner's argument that a state court petition was "pending" until petitioner

8

received actual notice of final state court action).

In some circumstances, a petitioner's substantially delayed receipt of an order that triggers an AEDPA limitations period may be adequate grounds for the application of equitable tolling. But those cases have extreme facts and involve petitioners that exhibit much greater diligence than this Petitioner has shown.

For example, in *Knight v. Schofield*, the Eleventh Circuit held that a habeas petitioner was entitled to equitable tolling after he received late notice of a Georgia Supreme Court decision denying his petition for writ of certiorari. 292 F.3d 709, 711 (11th Cir. 2002). In that case, upon filing a petition for discretionary review from the Georgia Supreme Court, the petitioner asked the clerk of that court when he could expect a ruling. *Id.* at 710. The clerk of that court told the petitioner that he would be informed of the court's decision as soon as it was issued. *Id.* But when the court issued its decision, the clerk inadvertently sent notice of the court's decision to the wrong person. *Id.* After mailing a letter to the court inquiring about the status of his petition, he was informed that his petition had been denied eighteen months earlier. *Id.* At that point, the one-year limitation established by AEDPA had run, and the federal habeas petition that the petitioner eventually filed was dismissed as untimely by the federal district court. *Id.* at 711.

In holding that equitable tolling was appropriate, the *Knight* court emphasized that the petitioner had "exercised diligence in inquiring about the decision" and that it was understandable that the petitioner had not made other inquiries because the clerk of the Georgia Supreme Court assured him that he would receive a copy of the court's decision once it was issued. *Id.* The Eleventh Circuit, however, noted that "not in every case will a prisoner be entitled to equitable tolling until he receives notice. Each case turns on its own facts." *Id.*

After *Knight,* courts have held that a habeas petitioner's efforts to ascertain the disposition of pre-federal habeas steps is crucial to determining whether equitable tolling is appropriate. *See, e.g., Logreira v. Sec'y for the Dep't of Corrs.*, 161 F.App'x 902, 904 (11th Cir. 2006)(equitable tolling not appropriate where after petitioner learned that his state habeas application had been denied, he waited six months to file his § 2254 petition and provided "no explanation, let alone a causal connection, between his delayed receipt" of a lower court order and his untimely filing of his § 2254 petition); *Wade v. Battle*, 379 F.3d 1254, 1265-66 (11th Cir. 2004)("extraordinary

circumstances" did not exist warranting equitable tolling after petitioner delayed filing habeas petition for several months after receiving a potentially misleading notice from the Georgia Supreme Court); *Drew*, 297 F.3d at 1288 ("A *lengthy* delay between the issuance of a necessary order and an inmate's receipt of it might provide a basis for equitable tolling if the petitioner has diligently attempted to ascertain the status of that order and if the delay prevented the inmate from filing a timely federal habeas corpus petition.")(emphasis supplied).

In a recent decision, the Eleventh Circuit held that a trial court erred when it failed to conduct an evidentiary hearing as to the circumstances surrounding a habeas petitioner's untimely filing and whether that petitioner acted diligently. *Hollinger v. Sec'y Dep't of Corrs.*, No. 08-15472, 2009 WL 1833746, at *5 (11th Cir. June 26, 2009). In that case, the petitioner did not learn of a state court's order denying his motion for post-conviction relief until more than eight months after the order was entered. *Id.* at *1. By the time the petitioner learned of the state court's order, only twelve days remained on his AEDPA clock. *Id.* at *2. Ultimately, the federal district court dismissed his petition as time-barred because the petitioner had not been able to demonstrate that "a causal connection existed between the state court's failure to notify him of the disposition of his [motion for post-conviction relief] and his ability to timely file the instant habeas petition." *Id.*

In *Hollinger*, the petitioner responded to the State's motion to dismiss his petition as untimely with evidence related to his diligence. For instance, that petitioner submitted a prison mail log showing that he received no legal mail during the period in which he would have received the state court's order denying his motion for post-conviction relief. *Id.* at *1 n.2. The *Hollinger* petitioner also submitted a copy of his letter inquiring about the status of his motion for post-conviction relief. *Id.* Further, in *Hollinger*, the mailing problem surrounding the state court order consumed a significant portion of the petitioner's AEDPA clock and left him with only twelve days to file his habeas petition.

The circumstances surrounding the *Hollinger* petitioner's untimely habeas petition markedly differ from those affecting the Petitioner. The Petitioner submitted no evidence supporting his position that the two-week delay in receiving the U.S. Supreme Court's denial of his petition for writ

10

of certiorari ultimately caused the late filing of the Petition.[6]  In fact, unlike the petitioners in *Hollinger*, *Drew*, and *Knight*, the Petitioner does not allege that the clerk of the U.S. Supreme Court failed to send him a copy of the Court's order.  The Petitioner also does not allege that his lawyer at the U.S. Supreme Court-level did not receive a copy of the order denying the petition for writ of certiorari.  Instead, the Petitioner argues that he did not know of the U.S. Supreme Court's order until it was docketed with the Florida Supreme Court.  But all along the Petitioner knew that he had an appeal pending in the U.S. Supreme Court, and the Petitioner offers no reason why the Florida Supreme Court's docket would be a better source of information about the U.S. Supreme Court's decisions.  And, most importantly, this Court is bound by the well-settled rule that the U.S. Supreme Court's denial of a petition for writ of certiorari takes legal effect immediately upon its issuance.  Finally, the Petitioner's receipt of the U.S. Supreme Court's order two weeks after it was issued is not the kind of exceptional circumstance required for equitable tolling.  After receiving the U.S. Supreme Court's decision, the Petitioner had ample time remaining on his AEDPA clock in which he could have presented a timely federal habeas petition.

Indeed, the Petitioner's circumstances are most analogous to those described in *Wainwright v. Sec'y Dep't of Corrs.*, 537 F.3d 1282 (11th Cir. 2007).  *Wainwright* also involved a petitioner under a death sentence whose federal petition for writ of habeas corpus was dismissed as untimely.  *Id.* at 1283-84.  In that case, the petitioner waited until only five days remained on his AEDPA clock before filing a Rule 3.850 motion for post-conviction relief.  *Id.*  Once the Florida Supreme Court issued its mandate denying the petitioner's Rule 3.850 motion, the petitioner waited six days beyond the one-year limitation to file his federal petition for writ of habeas corpus.  *Id.*  The petitioner sought equitable tolling partly based on the fact that his attorney never received a copy of the Florida Supreme Court's order denying his motion for rehearing in the Rule 3.850 proceedings.  *Id.* at 1286.  The petitioner's attorney did not receive the order when he moved to a new office and failed to notify the Florida Supreme Court of his new address.  *Id.*  The Eleventh Circuit held that those facts did not warrant the application of equitable tolling because attorney error is not an extraordinary circumstance.  *Id.*  The *Wainwright* court also found that the petitioner was not entitled to equitable

---

[6]      San Martin submitted an affidavit from a co-conspirator with his reply.  The affidavit did not address the timeliness arguments raised by the State.

11

tolling because he did not prove or allege that he failed to (1) ultimately receive the order denying his motion for rehearing or (2) receive the Florida Supreme Court's mandate. *Id.* at 1286 n.3.

An evidentiary hearing is not necessary to dispose of the Petitioner's reasons for equitable tolling. As the *Drew* court noted, § 2244 "does not require a hearing on the issue of time-bar or equitable tolling, so the decision as to whether to conduct an evidentiary inquiry is a matter left to the sound discretion of the district court." 297 F.3d at 1292. Accepting as true the Petitioner's statements regarding his delayed receipt of the U.S. Supreme Court's order, equitable tolling would not be appropriate because the Petitioner's situation was not "extraordinary," and the Petitioner showed no diligence in either ascertaining the status of the U.S. Supreme Court's order or attempting to promptly proceed with his motion for post-conviction relief.

### b.   Lack of Assistance of Counsel

Next, the Petitioner argues that he is entitled to equitable tolling because he lacked counsel at or around the time the U.S. Supreme Court denied his petition for writ of certiorari. Courts have rejected arguments relating to both lack of counsel and inadequate assistance of counsel at the post-conviction stage. *Felder v. Johnson*, 204 F.3d 168, 172-72 (5th Cir. 2000)(rejecting the application of equitable tolling because "proceeding pro se is not a 'rare and exception circumstance because it is typical of those bringing a § 2254 claim"). In *Lawrence*, the Supreme Court held that attorney error (even if the attorney is State-appointed) was "simply not sufficient to warrant equitable tolling, particularly in the post[-]conviction context where prisoners have no constitutional right to counsel." 549 U.S. at 336-37. Accordingly, the Petitioner is not entitled to equitable tolling because he lacked counsel when the U.S. Supreme Court denied his petition for writ of certiorari.

### c.   Hurricane Floyd

Finally, the Petitioner argues that the one-year limitation was tolled because of tolling orders entered on account of Hurricane Floyd.[7]  This argument also does not justify the application of

---

[7]      San Martin does not identify which court entered tolling orders as a result of Hurricane Floyd. The Court's research indicates that the Florida Supreme Court issued two tolling orders because of Hurricane Floyd. That court's orders tolled deadlines in Orange and Osceola counties on September 13, 1999. Another order tolled deadlines in Hernando, Lake, Marion, and Sumter counties on September 13-14, 1999.

12

equitable tolling. The Petitioner does not allege that Hurricane Floyd limited his ability to timely file his § 2254 petition. Instead, the Petitioner's argument appears to be that he is entitled to a two-day tolling of the one-year limitation simply because Hurricane Floyd happened and some counties were subject to tolling by administrative order. Even if Hurricane Floyd resulted in conditions that directly affected the Petitioner (for example, through the imposition of a lock down at the prison), the Petitioner would still have to show that the hurricane prevented him from using the remainder of the time left on his AEDPA clock to timely file his petition. *Sanchez v. United States*, 170 F.App'x 643, 647 (11th Cir. 2006).

The Petitioner appears to argue that Hurricane Floyd delayed him from filing his Rule 3.850 motion which allowed AEDPA's one-year limitation to continue running without the application of statutory tolling while he pursued state post-conviction relief. The Petitioner had from October 1998 and then after Hurricane Floyd to prepare and file his Rule 3.850 motion. The Petitioner verified his Rule 3.850 motion on September 24, 1999. Accordingly, the Petitioner could have filed his Rule 3.850 motion before October 4, 1999. The Petitioner is not entitled to equitable tolling because the Petitioner offers no explanation of how Hurricane Floyd delayed his filing. And even if the Court granted him a two-day equitable enlargement to file his § 2254 petition, his filing on December 18, 2008, would still be untimely.

### 2.  Actual Innocence[8]

The Petitioner argues that he is actually innocent (both of the crime and of the death penalty) because the State allegedly knowingly introduced the false or misleading testimony of one of the

---

[8]      The State argues that the Petitioner's actual innocence claims are procedurally barred under *Wainwright v. Sykes*, 433 U.S. 72, 86-87 (1977). The Florida Supreme Court did not consider the Petitioner's actual innocence claims because they were inadequately presented at that level. *San Martin*, 995 So. 2d at 254 n.6. In declining to consider the Petitioner's actual innocence arguments, the Florida Supreme Court applied a Florida procedural rule that requires that appellants present more than conclusory legal arguments. *See Whitfield v. State*, 923 So. 2d 375, 378-79 (Fla. 2006)(citing numerous cases for the proposition that arguments are not properly presented for appellate review when they are factually unsupported or are raised in briefs that incorporate by reference arguments made in lower courts). Actual innocence is a device used to overcome a procedural default. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). This Court does not consider whether an actual innocence claim itself can be procedurally defaulted. The Court need not reach this question because the Petitioner's actual innocence claims are not meritorious.

13

Petitioner's co-conspirators.[9] The testimony concerned the timing of the Petitioner and his co-conspirators' plans to kill the bodyguard.

The Petitioner's actual innocence claims are legally insufficient. At this stage, this Court is required to determine whether the Petitioner has shown that he is factually innocent of the crimes at issue. To accomplish this, the Petitioner had to put forth new evidence that, if presented at trial and considered by a reasonable juror, would more likely than not have resulted in an acquittal. In support of his actual innocence claim, the Petitioner has presented an affidavit in which his co-conspirator states that neither he nor the Petitioner knew of any plans to kill anyone during the course of the robbery. The affiant also states that prosecutors pressured him to testify that he and his co-conspirators planned to kill someone during the robbery.

That affidavit is not evidence of factual innocence. Regardless of when and whether the Petitioner planned to kill another person, the murdered individual was killed while the Petitioner perpetrated a robbery. A murder committed under those circumstances is first degree felony murder under Florida law. *See Young v. State*, 739 So. 2d 553, 560 (Fla. 1999).

That affidavit also does not establish that the Petitioner is actually innocent of the death penalty. The Petitioner has not presented any evidence, clear and convincing or otherwise, that "none of the aggravating factors legally necessary for the invocation of the death penalty applied." *Sibley*, 377 F.3d at 1205. The aggravating factors necessary for the imposition of the death penalty are listed in § 921.141(5) of the Florida Statutes. The trial court imposed the death penalty based on its finding of the existence of several statutory aggravating factors that are wholly unchallenged by the Petitioner. For example, the Petitioner has not challenged that the underlying capital felony was committed for pecuniary gain. *See* Fla. Stat. § 921.141(5)(f). The Petitioner also has not challenged the aggravating factors that he was convicted of another capital felony or of a felony involving a threat of violence to the person and that the capital felony was committed during the course of a robbery. *See* Fla Stat. §§ 921.141(5)(b), (d).

---

[9]     The Petitioner states that he is actually innocent "[f]or all the reasons set forth in [the Petition]." The Petitioner, however, raises numerous grounds in the Petition that clearly are not actual innocence claims under the applicable law. For instance, the Petitioner raises claims related to alleged procedural defects in his trial and ineffective assistance of counsel. At best, these are arguments of legal innocence not factual innocence.

14

Because *Sibley* and other applicable case law require the presence of the minimum aggravating factors required by state law, and Florida law does not require the presence of more aggravating factors than those the Petitioner has not challenged, the Petitioner has not established that he is actually innocent of the death penalty. *See also Johnson v. Singletary*, 938 F.2d 1166, 1183 (11th Cir. 1991)(holding that a petitioner would have to show that he is actually innocent of the death penalty by demonstrating that, but for the error, "the sentencing body *could not* have found *any* aggravating factor" and, accordingly, "the jury would have lacked the discretion to impose the death penalty; that is, that [the petitioner] is *ineligible* for the death penalty")(emphasis in original).

### III.    Conclusion

For all of the foregoing reasons, the Petition is denied as untimely.  This case is closed and all pending motions are denied as moot.

DONE and ORDERED in Chambers, Miami, Florida, August _13_, 2009.

Paul C. Huck
United States District Judge

Copies furnished to:
All Counsel of Record

16